# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | |
|---|---|
| WILLIAM MAY, Individually and for Others Similarly Situated | Case No. ___2:25-cv-484___ ___ |
| v. | |
| REFLECTANCE ENERGY, LLC | Jury Trial Demanded FLSA<br><br>Collective Action |

## ORIGINAL COLLECTIVE ACTION COMPLAINT

### SUMMARY

1.      William May (May) brings this collective action to recover unpaid wages and other damages from Reflectance Energy, LLC (Reflectance).

2.      Reflectance employed May as one of its Hourly Employees (defined below) in West Virginia.

3.      May and the other Hourly Employees regularly work more than 40 hours a workweek.

4.      Reflectance pays them by the hour.

5.      But Reflectance does not pay May and the other Hourly Employees for all their hours worked, including overtime hours.

6.      Rather, Reflectance requires May and the other Hourly Employees to attend safety and production meetings, while on Reflectance's premises, "off the clock" (Reflectance's "pre-shift off the clock policy").

7.      Reflectance does not pay May and the other Hourly Employees for the time they spend attending these safety and production meetings, "off the clock," before their shifts.

8.      Additionally, Reflectance automatically rounds May's and the other Hourly Employee's clock in and clock out times for its own primary benefit (Reflectance's "rounding policy").

9.     Additionally, Reflectance pays May and the other Hourly Employees non-discretionary bonuses, including safety, production, and retention bonuses, that Reflectance fails to include in their regular rates of pay for overtime purposes (Reflectance's "bonus pay scheme").

10.     Reflectance's pre-shift off the clock policy and bonus pay scheme violate the Fair Labor Standards Act (FLSA) by failing to compensate May and the other Hourly Employees at 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 in a workweek.

### Jurisdiction & Venue

11.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. 29 U.S.C. § 216(b).

12.     This Court has personal jurisdiction over Reflectance because it maintains its principal place of business in West Virginia.

13.     Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division. 28 U.S.C. § 1391(b)(2).

14.     Specifically, Reflectance employed May subject to its pre-shift off the clock policy and bonus pay scheme in its Ned's Branch, Harry's Branch, and Pete's Branch Surface Mines in Mingo County, West Virginia, which are in this District and Division.

### Parties

15.     Reflectance employed May as an equipment operator from approximately June 2022 until March 2025.

16.     Throughout his employment, Reflectance subjected May to its pre-shift off the clock policy and bonus pay scheme.

17.     May's written consent is attached as **Exhibit 1**.

18.    May brings this collective action on behalf of himself and other Reflectance employees subject to Reflectance's pre-shift off the clock policy on and/or bonus pay scheme.

19.    The putative FLSA collective of similarly situated employees is defined as:

> **All hourly Reflectance employees who worked during the last three years through final resolution of this action (the "Hourly Employees").**

20.    Reflectance is a West Virginia limited liability company with its principal place of business in Beckley, West Virginia.

21.    Reflectance may be served with process through its registered agent: **CSC, P.O. 13397 Philadelphia, Pennsylvania 19101**.

### FLSA COVERAGE

22.    At all relevant times, Reflectance was an "employer" within the meaning of the FLSA. 29 U.S.C. § 203(d).

23.    At all relevant times, Reflectance was an "enterprise" within the meaning of the FLSA. 29 U.S.C. § 203(r).

24.    At all relevant times, Reflectance was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials—such as cell phones, tools, and personal protective equipment—that have been moved in or produced for commerce. 29 U.S.C. § 203(s)(1).

25.    At all relevant times, Reflectance had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

26.    At all relevant times, May and the other Hourly Employees were Reflectance's "employees" within the meaning of the FLSA. 29 U.S.C. § 203(e).

27.    At all relevant times, May and the other Hourly Employees were engaged in commerce or in the production of goods for commerce.

## FACTS

28.    Reflectance operates a complex of coal mines in Mingo County, West Virginia.

29.    To meet its business objectives, Reflectance employs workers, including May and the other Hourly Employees, to extract and process coal.

30.    For example, Reflectance employed May as an equipment operator from approximately June 2022 until March 2025 in its Ned's Branch Surface Mine, Harry's Branch Surface Mine, and Pete's Branch Surface Mines.

31.    As an equipment operator, May operated a haul truck, a rock loader truck, and a grader truck to transport and haul rocks within the mine premises.

32.    May's job duties likewise included attending production and safety meetings on Reflectance's premises, before his scheduled shifts.

33.    Throughout his employment, Reflectance recorded May's "on the clock" hours through its designated timekeeping system.

34.    Thus, Reflectance's employment records reflect the number of "on the clock" hours it recorded working each week.

35.    Throughout his employment, May regularly worked more than 40 hours a workweek.

36.    Indeed, throughout his employment, May typically worked approximately 11.5 hours a day and 5 days a week (57.5 hours a workweek) "on the clock."

37.    But Reflectance merely assumed that May worked exactly his pre-scheduled 11.5 hour shift each workday, despite the fact he worked beyond his pre-scheduled shift each workday.

38.    Throughout his employment, Reflectance did not pay May for all his hours worked.

39.    Instead, throughout his employment, Reflectance subjected May to its pre-shift off the clock policy.

40.    Specifically, Reflectance required May to attend daily production and weekly safety meetings, on Reflectance's premises, "off the clock," and without compensation.

41.    This took May approximately 20 to 35 minutes each workday.

42.    May could not perform his principal job duties in accordance with Reflectance's policies, procedures, and expectations without attending these required meetings.

43.    The safety and production meetings were therefore integral and indispensable work duties for May fundamentally intertwined with his job duties as an equipment operator in the mines.

44.    But under its pre-shift off the clock policy, Reflectance does not compensate him for the same.

45.    Thus, because of its pre-shift off the clock policy, Reflectance failed to pay May overtime wages for all his overtime hours worked during workweeks May worked in excess of 40 hours.

46.    Additionally, Reflectance subjected May to its rounding policy.

47.    Specifically, Reflectance rounded his recorded hours to 11.5 a workday for Reflectance's—not Speigle's—primary benefit.

48.    But May regularly worked in excess of 11.5 hours in a workday completing his regular work duties.

49.    Thus, under Reflectance's rounding policy, it denied May wages for hours worked, including overtime wages for overtime hours worked.

50.    May and the other Hourly Employees perform their jobs under Reflectance's supervision and use materials, equipment, and technology Reflectance approves and supplies.

51.     Reflectance requires May and the other Hourly Employees to follow and abide by common work, time, pay, and overtime policies and procedures in the performance of their jobs.

52.     May's and the other Hourly Employees' work must strictly adhere to the uniform standards put in place by Reflectance.

53.     At the end of each pay period, May and the other Hourly Employees receive wages from Reflectance that are determined by common systems and methods that Reflectance selects and controls.

54.     Likewise, the other Hourly Employees typically work 11.5 hours a day and 5 days a week (57.5 hours a workweek) "on the clock."

55.     But, just as with May, Reflectance fails to pay them for all their hours worked.

56.     Indeed, Reflectance uniformly subjects the other Hourly Employees to the same or similar pre-shift off the clock policy it imposed on May.

57.     Specifically, just as with May, Reflectance requires them to attend production and safety meetings prior to their shifts, on its premises, "off the clock," and without compensation.

58.     Thus, just as with May, Reflectance does not pay the other Hourly Employees for this integral and indispensable work they are required to perform "off the clock" before their scheduled shifts.

59.     And, just as with May, these job duties take the other Hourly Employees approximately 20 to 35 minutes to complete each workday.

60.     Reflectance fails to exercise its duty as the Hourly Employees' employer to ensure they are not performing work "off the clock" on its premises that Reflectance does not want performed.

61.     And Reflectance knows, should know, or recklessly disregards whether May and the other Hourly Employees routinely perform integral and indispensable work "off the clock," and without compensation, before and after their scheduled shifts for Reflectance's primary benefit.

- 6 -

62.    Thus, Reflectance requests, suffers, permits, or allows May and the other Hourly Employees to work "off the clock," without compensation, before their scheduled shifts.

63.    Despite accepting the benefits, Reflectance does not pay May and the other Hourly Employees for the compensable work they perform "off the clock."

64.    Thus, under Reflectance's uniform pre-shift off the clock policy, May and the other Hourly Employees are denied overtime wages for the compensable work they perform "off the clock" before their scheduled shifts during workweeks in which they work more than 40 hours.

65.    And like May, Reflectance subjects the other Hourly Employees to its rounding policy.

66.    Reflectance rounds their recorded hours to 11.5 a workday for Reflectance's—not these employee's—primary benefit.

67.    But the other Hourly Employees regularly work in excess of 11.5 hours a workday completing their regular work duties.

68.    And throughout their employment, Reflectance has not paid May and the other Hourly Employees at the required premium rate for all hours worked in excess of 40 in a workweek.

69.    Instead, Reflectance pays May and the other Hourly Employees under its bonus pay scheme.

70.    Specifically, Reflectance agrees to pay and subsequently pays May and the other Hourly Employees non-discretionary bonuses, including safety, production, and retention bonuses that are paid based on formulas it determines and implements.

71.    But Reflectance fails to include these non-discretionary bonuses in these employees' regular rates of pay for overtime purposes.

72.    Thus, under Reflectance's bonus pay scheme, it does not pay May and the other Hourly Employees overtime wages at the required rate—based on all remuneration—for all hours they work in excess of 40 in a workweek.

73.     The Hourly Employees are thus uniformly subject to the same or similar unlawful policies—Reflectance's pre-shift off the clock policy and bonus pay scheme—for similar work, in willful violation of the FLSA.

### COLLECTIVE ACTION ALLEGATIONS

74.     May brings his claims as a collective action under Section 216(b) of the FLSA.

75.     Like May, the other Hourly Employees are victimized by Reflectance's pre-shift off the clock policy, rounding policy, and/or bonus pay scheme.

76.     Other Hourly Employees worked with May and indicated they were paid in the same manner, performed similar work, and were subject to Reflectance's same pre-shift off the clock policy, rounding policy, and/or bonus pay scheme.

77.     Based on his experience with Reflectance, May is aware Reflectance's pre-shift off the clock policy, rounding policy, and bonus pay scheme were imposed on other Hourly Employees.

78.     The Hourly Employees are similarly situated in the most relevant respects.

79.     Even if their precise job duties and locations might vary, these differences do not matter for the purpose of determining their entitlement to overtime wages at the required premium rate for all overtime hours worked.

80.     Therefore, the specific job titles or locations of the Hourly Employees do not prevent collective treatment.

81.     Rather, Reflectance's pre-shift off the clock policy and bonus pay scheme render May and the other Hourly Employees similarly situated for the purpose of determining their right to overtime wages at the required rate for all overtime hours worked.

82.     Reflectance's records reflect the number of "on the clock" hours the Hourly Employees were recorded as working each week.

83. Reflectance's records also show it paid the Hourly Employees non-discretionary bonuses it failed to include in their regular rates of pay.

84. The back wages owed to May and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

85. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Reflectance's records, and there is no detraction from the common nucleus of liability facts.

86. Therefore, the issue of damages does not preclude collective treatment.

87. May's experiences are therefore typical of the experiences of the other Hourly Employees.

88. May has no interest contrary to, or in conflict with, the other Hourly Employees that would prevent collective treatment.

89. Like each Hourly Employee, May has an interest in obtaining the unpaid wages owed under federal law.

90. May and his counsel will fairly and adequately protect the interests of the Hourly Employees.

91. May retained counsel with significant experience in handling complex collective action litigation.

92. Absent this collective action, many Hourly Employees will not obtain redress for their injuries, and Reflectance will reap the unjust benefits of violating the FLSA.

93. Further, even if some of the Hourly Employees could afford individual litigation, it would be unduly burdensome to the judicial system.

94. Indeed, the multiplicity of actions would cause hardship to the Hourly Employees, the Court, and Reflectance.

95.     Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

96.     The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual members.

97.     Among the common questions of law and fact are:

    a.     Whether Reflectance imposed its pre-shift off the clock policy on the Hourly Employees;

    b.     Whether Reflectance's pre-shift off the clock policy deprived the Hourly Employees of overtime compensation for overtime hours worked;

    c.     Whether Reflectance automatically rounded the Hourly Employees' recorded hours;

    d.     Whether Reflectance paid the Hourly Employees non-discretionary bonuses;

    e.     Whether Reflectance engaged in a policy or practice of failing to include non-discretionary bonuses in the Hourly Employees' regular rates of pay for overtime purposes;

    f.     Whether Reflectance failed to pay the Hourly Employees overtime wages at the required premium rates—based on all remuneration—for all overtime hours worked;

    g.     Whether Reflectance's decision not to pay the Hourly Employees overtime wages at the required rates—based on all remuneration—for all overtime hours worked was made in good faith; and

    h.     Whether Reflectance's violations were willful.

98.    May knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a collective action.

99.    As part of its regular business practices, Reflectance intentionally, willfully, and repeatedly violated the FLSA with respect to May and the other Hourly Employees.

100.    There are many similarly situated Hourly Employees who have been denied overtime pay at the required rate—based on all remuneration—for all overtime hours worked, in violation of the FLSA, who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

101.    The Hourly Employees are known to Reflectance, are readily identifiable, and can be located through Reflectance's business and personnel records.

## REFLECTANCE'S VIOLATIONS WERE WILLFUL

102.    Reflectance knew it employed the Hourly Employees.

103.    Reflectance knew it was subject to the FLSA's overtime provisions.

104.    Reflectance knew May and the other Hourly Employees were its non-exempt employees entitled to overtime pay.

105.    Reflectance knew the FLSA required it to pay non-exempt employees, including May and the other Hourly Employees, overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for all hours worked after 40 a workweek.

106.    Reflectance knew May and each Hourly Employee worked more than 40 hours in at least one workweek during the last 3 years because Reflectance recorded their "on the clock" hours via its timekeeping system.

107.    Reflectance knew it paid the Hourly Employees according to its pre-shift off the clock policy.

108. Reflectance knew it had a duty to ensure the Hourly Employees were not performing work "off the clock" (without pay).

109. Reflectance knew it required the Hourly Employees to attend production and safety meetings, on its premises, prior to their shifts, "off the clock."

110. Reflectance knew it controlled the Hourly Employees' work procedures.

111. Reflectance knew the Hourly Employees' mandatory "off the clock" work was a fundamental requirement of their jobs with Reflectance.

112. Reflectance knew the Hourly Employees' mandatory "off the clock" work was an integral and indispensable requirement to their principal job duties with Reflectance.

113. Reflectance knew the Hourly Employees routinely performed this daily, required "off the clock" work for Reflectance's predominant benefit.

114. In other words, Reflectance knew the Hourly Employees performed compensable work (*e.g.*, production and safety meetings) "off the clock" and without compensation.

115. Reflectance knew it automatically rounded the Hourly Employees' hours worked.

116. Reflectance knew this automatic rounding primarily benefited Reflectance to the detriment of the Hourly Employees.

117. Reflectance knew it paid May and the other Hourly Employees non-discretionary safety, production, and retention bonuses.

118. Reflectance knew these non-discretionary bonuses were not included in May's and the other Hourly Employees' regular rates of pay for overtime purposes.

119. And Reflectance knew the FLSA required it to pay May and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 a workweek.

120.    Reflectance knew May and the other Hourly Employees regularly worked in excess of 40 hours a workweek.

121.    Thus, Reflectance knew, should have known, or recklessly disregarded whether it failed to pay May and the other Hourly Employees at least 1.5 times their regular rates of pay—based on all remuneration—for all the hours they worked in excess of 40 a workweek.

122.    Reflectance's failure to pay May and the other Hourly Employees overtime at the required rates—based on all remuneration—for all overtime hours worked was neither reasonable, nor was this decision made in good faith.

123.    Reflectance knowingly, willfully, and/or in reckless disregard of the FLSA carried out its unlawful bonus pay scheme and pre-shift off the clock policy that deprived May and the other Hourly Employees of overtime wages at the required rate of pay—based on all remuneration—for all hours worked after 40 a workweek, in violation of the FLSA.

<u>CAUSE OF ACTION</u>

**FAILURE TO PAY OVERTIME UNDER THE FLSA
(FLSA COLLECTIVE)**

124.    May brings his FLSA claim as a collective action on behalf of himself and the other Hourly Employees pursuant to 29 U.S.C. § 216(b).

125.    Reflectance violated, and is violating, the FLSA by employing non-exempt employees, such as May and the other Hourly Employees, in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for the hours they worked in excess of 40 a workweek.

126.    Reflectance's unlawful conduct harmed May and the other Hourly Employees by depriving them of the overtime wages they are owed.

127.    Accordingly, Reflectance owes May and the other Hourly Employees the difference between the wages actually paid and the overtime wages actually earned.

128.    Because Reflectance knew, or showed reckless disregard for whether its bonus pay scheme and pre-shift off the clock policy violated the FLSA, Reflectance owes May and the other Hourly Employees these wages for at least the past 3 years.

129.    Reflectance is also liable to May and the other Hourly Employees for an amount equal to all their unpaid overtime wages as liquidated damages.

130.    Finally, May and the other Hourly Employees are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

**JURY DEMAND**

131.    May demands a trial by jury on all Counts.

**RELIEF SOUGHT**

WHEREFORE, May, individually and on behalf of the other Hourly Employees, seeks the following relief:

a.    An Order designating this lawsuit as a collective action and authorizing notice to the Hourly Employees allowing them to join this action by filing a written notice of consent;

b.    An Order finding Reflectance liable to May and the other Hourly Employees for unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

c.    Judgment awarding May and the other Hourly Employees all unpaid wages, liquidated damages, statutory damages, and any and other penalties available under the FLSA;

d.    An Order awarding attorneys' fees, costs, and expenses to the Hourly Employees;

e.    An Order awarding pre- and post-judgement interest at the highest

applicable rates; and

f.    Such other and further relief as may be necessary and appropriate.

Date:   August 4, 2025

Respectfully submitted,

**POWELL & MAJESTRO, PLLC**

By: */s/ Anthony J. Majestro*
Anthony J. Majestro WVSB No. 5165
Graham B. Platz WVSB 14093
405 Capitol Street, Suite 807
Charleston, West Virginia 25301
Phone: (304) 346-2889
Fax: (304) 346-2895
amajestro@powellmajestro.com
gplatz@powellmajestro.com

Michael A. Josephson*
Andrew W. Dunlap*
**JOSEPHSON DUNLAP LLC**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Phone: (713) 352-1100
Fax: (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch*
**BRUCKNER BURCH PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Phone: (713) 877-8788
Fax: (713) 877-8065
rburch@brucknerburch.com

*Pro hac vice applications forthcoming*

**ATTORNEYS FOR MAY &
THE HOURLY EMPLOYEES**